JOON H. KIM
Acting United States Attorney for the
Southern District of New York
By: JESSICA JEAN HU
    ELIZABETH M. TULIS
Assistant United States Attorneys
86 Chambers Street
New York, New York 10007
Telephone: (212) 637-2726/2725
Fax:  (212) 637-2717
E-mail:  jessica.hu@usdoj.gov
         elizabeth.tulis@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RESIDENTIAL HOME FUNDING CORP.<br><br>Defendant. | 17 Civ. 7192<br><br>**COMPLAINT** |

Plaintiff the United States of America (the "United States" or "Government"), by and through its attorney, Joon H. Kim, Acting United States Attorney for the Southern District of New York, brings this action against Residential Home Funding Corp. ("Residential Home") alleging upon information and belief as follows:

**INTRODUCTION**

1.      This is a civil mortgage fraud lawsuit brought by the United States against Residential Home.

2.      From 2006 through 2012 (the "Covered Period"), Residential Home repeatedly made false statements in order to participate in the Direct Endorsement Lending ("DEL") program of the Federal Housing Administration ("FHA") of the U.S. Department of Housing and Urban Development ("HUD").  Such false statements included certifications that Residential

Home had in place a quality control plan that was compliant with HUD-FHA regulations, and that Residential Home was conducting quality control reviews of early payment default loans ("EPD Loans"), as was required by HUD. EPD Loans are mortgages that go into default (i.e., are more than 60 days past due) within the first six payments on the mortgage.

3.     In reliance on these false statements, the Government allowed Residential Home to participate in the DEL program as a private lender with authority to endorse mortgages for FHA insurance ("DEL Lender"). If Residential Home approved a loan for FHA insurance in its capacity as a DEL Lender and the loan subsequently defaulted, HUD would cover any losses on the loan.

4.     During the Covered Period, as an approved DEL Lender, Residential Home endorsed more than four thousand mortgages for FHA insurance, totaling more than $1,169,516,323 in underlying principal obligations. Many of those loans have since defaulted, causing HUD to cover the losses on the loans.

5.     Moreover, whenever Residential Home approved a loan for FHA insurance, it certified to HUD that the loan complied with the rules governing the FHA-insurance program. However, notwithstanding these certifications, throughout the Covered Period, Residential Home recklessly approved for FHA insurance loans that violated FHA-insurance program rules, including rules aimed at ensuring that loans were given only to borrowers who were likely to make their mortgage payments. Many such loans ultimately defaulted, causing HUD to cover the losses on the loans.

6.     In reliance on Residential Home's above-referenced false statements, including its misrepresentations as to the quality of the loans it was approving for FHA insurance, the

2

Government paid millions in insurance claims for mortgages that Residential Home should never have approved in the first place.

7.     The Government brings this action seeking damages and penalties for these claims under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and the common law seeking damages and penalties for Residential Home's misconduct.

## JURISDICTION & VENUE

8.     This Court has jurisdiction pursuant to 31 U.S.C. § 3730(a), 28 U.S.C. §§ 1331 and 1345, and the Court's general equitable jurisdiction.

9.     Venue is appropriate in this judicial district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)(l) and (c) because Residential Home transacts significant business within this district and is therefore subject to personal jurisdiction in this judicial district..

10.     The Government and Residential Home entered into several tolling agreements, pursuant to which the parties agreed that any statute of limitations applicable to the claims at issue here would be tolled from and including March 30, 2015 through and including September 21, 2017.

## PARTIES

11.     Plaintiff is the United States of America.

12.     Defendant Residential Home is a New York corporation headquartered in New Jersey that conducts business throughout New York.

13.     From June 2006 through the present, Residential Home has been a DEL Lender. During that time period, Residential Home has employed several hundred employees and has been licensed to originate residential mortgages in 12 states, including New York.

3

<u>**FACTS**</u>

I.      **BACKGROUND**

    **A.  The FHA Direct Endorsement Program**

14.      FHA is the largest insurer of residential mortgages in the world.  Pursuant to the

National Housing Act of 1934, FHA offers various mortgage insurance programs.  Through

these programs, FHA insures approved lenders against losses on mortgage loans.  FHA mortgage

insurance may be granted on mortgages used to purchase homes, improve homes, or to refinance

existing mortgages.  FHA's single family mortgage insurance programs cover owner-occupied

principal residences.

15.      FHA mortgage insurance programs help low-income and moderate-income

families become homeowners by lowering some of the costs of their mortgage loans.  FHA

mortgage insurance encourages lenders to make loans to otherwise creditworthy borrowers who

might not be able to meet conventional underwriting requirements by protecting the lenders

against defaults on mortgages.

16.      To qualify for FHA mortgage insurance, a mortgage must meet all of the

applicable HUD requirements.  Those requirements relate to, among other things, the adequacy

of the borrower's income to meet the mortgage payments and other obligations, the borrower's

creditworthiness, and the appropriateness of the valuation of the property subject to the

mortgage.

17.      HUD operates the DEL program as part of the FHA-insured mortgage program.

Under the direct endorsement process, HUD does not itself conduct a detailed review of

applications for mortgage insurance before an FHA-insured mortgage closes.  Rather, approved

4

DEL Lenders must determine whether the proposed mortgage is eligible for FHA insurance under the applicable program regulations.  A DEL Lender underwrites and closes mortgages without prior HUD review or approval.  DEL Lenders submit documentation regarding underwritten loans after the mortgage has closed, and certify that the endorsed mortgage complies with HUD rules.

18.    The DEL Program works as follows: the DEL Lender originates a proposed loan, or in some instances, acts as a sponsoring lender by underwriting and funding proposed mortgages originated by other FHA lenders known as loan correspondents.  In either case, the DEL Lender ultimately reviews the proposed mortgage.  The borrower, along with the DEL Lender's representative, completes the loan application.  A loan officer collects all supporting documentation from the borrower and submits the application and documentation to the DEL Lender.  The DEL Lender obtains an appraisal.  A professional underwriter employed by the DEL Lender performs a mortgage credit analysis to determine the borrower's ability and willingness to repay the mortgage debt in accordance with HUD rules.  The DEL Lender's underwriter makes the underwriting decision as to whether the mortgage may be approved for FHA insurance or not, according to HUD rules.  If the underwriter has decided that the mortgage may be approved for FHA insurance in accordance with HUD rules, the DEL Lender closes the loan with the borrower.  Thereafter, the DEL Lender certifies that the mortgage qualifies for FHA insurance.  FHA then endorses the loan on the basis of the DEL Lender's certification and provides the DEL Lender with a mortgage insurance certificate.

19.    The DEL Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage.  FHA endorses mortgages in reliance

5

upon the DEL Lender's certifications that the mortgages may be approved for FHA insurance. DEL Lenders obligate HUD without independent HUD review.

20.     In the event that a borrower defaults on an FHA-insured mortgage, the holder of the mortgage is able to submit a claim to HUD for the costs associated with the defaulted mortgage.

21.     In the mortgage industry, the imprimatur of FHA mortgage insurance makes covered mortgages highly marketable for resale to investors both because such mortgages are expected to have met all HUD requirements and because they are insured by the full faith and credit of the United States.

**B. Direct Endorsement Lenders And Underwriters**

22.     A mortgage lender must apply to FHA's Office of Lender Activities and Program Compliance to become a DEL Lender.

23.     To qualify for FHA approval as a DEL Lender, a lender must have a qualified underwriter on staff.  The underwriter's responsibilities are critical elements of the DEL Program, and a DEL Lender must certify that each of its underwriters meet FHA qualifications.

24.     Each underwriter must be a full time employee of the mortgage lender and must either be a corporate officer with signatory authority or otherwise be authorized to bind the mortgage lender in matters involving origination of mortgage loans.  Each underwriter must also be a reliable and responsible professional who is skilled in mortgage evaluation and able to demonstrate knowledge and experience regarding principles of mortgage underwriting.

25.     An underwriter must "evaluate [each] mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other

6

obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.5(d).  In addition, an underwriter must "have [each] property appraised in accordance with [the] standards and requirements" prescribed  by HUD.  24 C.F.R. § 203.5(e).

### C.  Quality Control Prerequisites For Direct Endorsement Lenders

26.     To qualify for FHA approval as a DEL Lender, a lender must implement a quality control plan that ensures its underwriters' compliance with HUD rules.

27.     The development and implementation of a quality control plan is a basic eligibility requirement for DEL Lenders.  HUD has determined that the DEL program can be offered only if participating lenders have acceptable quality control plans.  Accordingly, as a precondition to DEL Lender approval, HUD will require each lender to have an acceptable quality control plan to manage, conduct, and review the underwriting of mortgages that are submitted for direct endorsement.

28.     A DEL Lender must have a fully functioning quality control program from the date of its initial FHA approval until final surrender or termination of its approval.  Thus, a DEL Lender must implement and continuously have in place a quality control plan as a condition of receiving and maintaining FHA approval.

29.     The purposes of quality control plans include ensuring that the procedures and personnel used by DEL Lenders when underwriting mortgages meet all HUD requirements, and providing procedures for correcting problems once a DEL Lender becomes aware of their existence.

30.     A mandatory HUD requirement for a DEL Lender's quality control plan is that it provide for the review of all EPD Loans.

31.     EPD Loans are markers of mortgage fraud.  EPD loans reveal that the borrower - whom the DEL Lender had certified as having met all criteria for creditworthiness, and could thus be expected to make payments for the life of the mortgage—could not, in fact, make even the first six payments of the mortgage.

32.     A DEL underwriter must review each EPD Loan for compliance with HUD underwriting requirements.  A DEL Lender that lacks a quality control program that provides for such review is in violation of HUD's quality control requirements.

### D.  DEL Lenders' Duties

#### 1)  Due Diligence As Required By Regulation

33.     HUD relies on DEL Lenders to conduct due diligence on DEL loans.  The purposes of due diligence include (1) determining a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties, *see* 24 C.F.R. § 203.5(d), and (2) examining the property offered as security for the loan to determine if it provides sufficient collateral, *see* 24 C.F.R. § 203.5(e)(3).  Due diligence thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay, cash to close, and collateral.  In all cases, a DEL Lender owes HUD the duty, as prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment."  24 C.F.R. § 203.5(c).

34.     HUD has set specific rules for due diligence predicated on sound underwriting principles.  In particular, HUD requires DEL Lenders to be familiar with, and to comply with, governing HUD Handbooks and Mortgagee Letters, which provide detailed processing instructions to DEL Lenders.  These materials specify the minimum due diligence with which DEL Lenders must comply.

35.     With respect to ensuring that borrowers have sufficient credit, a DEL Lender must comply with governing HUD Handbooks, such as HUD 4155.1, Mortgage Credit Analysis for Mortgage Insurance on One-to-Four-Family Properties, to evaluate a borrower's credit.  The rules set forth in HUD 4155.1 exist to ensure that a DEL Lender sufficiently evaluates whether a borrower has the ability and willingness to repay the mortgage debt.  HUD has informed DEL Lenders that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

36.     To properly evaluate a borrower's credit history, a DEL Lender must, at a minimum, obtain and review credit histories; analyze debt obligations; reject documentation transmitted by unknown or interested parties; inspect documents for proof of authenticity; obtain adequate explanations for collections, judgments, recent debts and recent credit inquiries; establish income stability and make income projections; obtain explanations for any gaps in employment; document any gift funds; calculate debt and income ratios and compare those ratios to the fixed ratios set by HUD rules; and consider and document any compensating factors permitting deviations from those fixed ratios.

37.     With respect to appraising the mortgaged property (i.e., collateral for the loan), a DEL Lender must ensure that an appraisal and its related documentation satisfy the requirements

9

in governing HUD Handbooks, such as HUD 4150.2, Valuation Analysis for Home Mortgage Insurance.  The rules set forth in HUD 4150.2 exist to ensure that a DEL Lender obtains an accurate appraisal that properly determines the value of the property for HUD's mortgage insurance purposes.

### 2)  Due Diligence As Required  By Common Law

38.     Direct Endorsement Lenders owe HUD a common law duty of due diligence.

39.     The exercise of due diligence is an affirmative duty of DEL Lenders.  This duty obligates DEL Lenders to comply with HUD rules, accepted practices of prudent lending institutions, and all procedures that a prudent lender would use if it looked solely to the property as security to protects its interests.  The duty further obligates the DEL Lender to use due care in providing information and advice to FHA.

40.     Indeed, "[t]he entire scheme of FHA mortgage guaranties presupposes an honest mortgagee performing the initial credit investigation with due diligence and making the initial judgment to lend in good faith after due consideration of the facts found."  *United States v. Bernstein*, 533 F.2d 775, 797 (2d Cir. 1976).

41.     HUD has apprised DEL Lenders of this common law duty since it first created the DEL program.  *See* 48 Fed. Reg. 11928, 11932 (Mar. 22, 1983) ("The duty of due diligence owed the Department by approved mortgagees is based not only on these regulatory requirements, but also on civil case law."); *id*. ("HUD considers the exercise of due diligence an affirmative duty on the part of mortgagees participating in the program.").

### 3)  The Fiduciary Duty Of Utmost Good Faith

42.     A fiduciary relationship exists between DEL Lenders and HUD.

10

43.     HUD relies on the expertise and knowledge of DEL Lenders in providing FHA insurance.  HUD places confidence in their decisions.  The confidence that HUD reposes in DEL Lenders invests those lenders with an advantage in the DEL Lenders' relationship with HUD.

44.     DEL Lenders are under a duty to act for HUD, and give advice to HUD, for HUD's benefit, as to whether mortgages should be insured by FHA under the DEL program.

45.     As a result of the fiduciary relationship between DEL Lenders and HUD, DEL Lenders have a duty to HUD of *uberrmiae fidea*, or the obligation to act with the utmost good faith, candor, honesty, integrity, fairness, undivided loyalty, and fidelity in dealings with HUD.

46.     The duty of *uberrmiae fidea* also requires DEL Lenders to refrain from taking advantage of HUD by the slightest misrepresentation, to make full and fair disclosures to HUD of all material facts, and to take on the affirmative duty of employing reasonable care to avoid misleading HUD in all circumstances.

47.     The duty of *uberrmiae fidea* further requires Direct Endorsement Lenders to exercise sound judgment, prudence, and due diligence on behalf of HUD in endorsing mortgages for FHA insurance.

### E.  Direct Endorsement Lender Certifications

#### 1)  Annual Certifications

48.     To obtain and maintain Direct Endorsement Lender status, a DEL Lender must submit an annual certification to HUD.

49.     The DEL Lender must make the following annual certification, in sum and substance:

I know or am in the position to know, whether the operations of the above named

11

mortgagee conform to HUD-FHA regulations, handbooks, and policies.  I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

50.     The annual certification requires compliance with the basic eligibility requirements for Direct Endorsement Lenders, which includes compliance with HUD rules concerning lender's quality control.

### 2)  Loan Application Certifications

51.     A DEL Lender must additionally submit a certification to FHA for each loan for which it seeks FHA insurance.

52.     A DEL Lender may use an FHA-approved automated underwriting system to review loan applications.  The automated underwriting system processes information entered by the DEL Lender and rates loans as either an "accept"/"approve" or a "refer"/"caution."

53.     In cases where a DEL Lender uses an FHA-approved automated underwriting system, and the system rates a loan as an "accept" or "approve," the DEL Lender must make the following certification, in sum and substance, in approving the loan for FHA insurance:

This mortgage was rated as an "accept" or "approve" by an FHA-approved automated underwriting system. As such, the undersigned representative of the mortgagee certifies to the integrity of the data supplied by the lender used to determine the quality of the loan, that  Direct Endorsement Underwriter reviewed the appraisal (if applicable) and further certifies that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program.  I hereby make all certifications required by this mortgage as set forth in HUD Handbook 4000.4.

54.     In cases where a DEL Lender uses an FHA-approved automated underwriting system, and the system rates a loan as "refer" or "caution," or in cases where a DEL Lender does

not use an FHA-approved automated underwriting system, the underwriter must make the

following certification, in sum and substance, in approving the loan for FHA insurance:

> This mortgage was rated as a "refer" or "caution" by a FHA-approved automated
> underwriting system, and/or was manually underwritten by a Direct Endorsement
> underwriter.  As such, the undersigned Direct Endorsement Underwriter certifies
> that I have personally reviewed the appraisal report (if applicable), credit
> application, and all associated documents and have used due diligence in
> underwriting this mortgage.  I find that this mortgage is eligible for HUD
> mortgage insurance under the Direct Endorsement program and I hereby make all
> certifications required for this mortgage as set forth in HUD Handbook 4000.4.

55.    The certifications in HUD Handbook 4000.4, incorporated by reference in the

certifications above, include the certification that the mortgage complies with HUD underwriting

requirements contained in all outstanding HUD Handbooks and Mortgagee Letters.

56.    Absent a truthful mortgage eligibility certification, a DEL Lender cannot endorse

a mortgage for FHA insurance.

**II.    RESIDENTIAL HOME'S DEL ACTIVITIES**

57.    Throughout the Covered Period, Residential Home maintained its status as an

FHA-approved mortgage company and DEL Lender, and it has maintained that status through

the date of this Complaint.

58.    Throughout the Covered Period, Residential Home filed with HUD annual

certifications of Residential Home's purported compliance with the DEL program's qualification

requirements, including the implementation of a compliant quality control plan.

59.    As a DEL Lender, throughout the Covered Period, Residential Home approved

more than four thousand mortgages for FHA insurance, totaling more than $1,169,516,323 in

underlying principal obligations.  For each mortgage, Residential Home certified that it complied

with all HUD rules in approving the loan for FHA insurance.

60.     As of December 31, 2012, of the more than 4,522 mortgages for FHA insurance

endorsed by Residential Home during the Covered Period, more than 1,019 of those mortgages

(i.e., approximately 22.5%) had defaulted.  Of those, more than 96 had defaulted within six

months of closing, more than 240 defaulted within a year of closing, and more than 534

defaulted within two years of closing.

61.     As of December 31, 2012, HUD had processed more than $13 million in FHA

insurance claims and related costs arising out of 70 mortgages that had been endorsed by

Residential Home and had defaulted during the Covered Period.  Of these, HUD had processed

more than $4.5 million in FHA claims and related costs arising out of more than 20 mortgages

that defaulted within six months of closing, more than $8.9 million in FHA claims and related

costs arising out of more than 41 mortgages that defaulted within a year of closing, and more

than $13 million in FHA claims and related costs arising out of more than 65 mortgages that

defaulted within two years of closing.

## III.     RESIDENTIAL HOME'S MISREPRENTATIONS

62.     Residential Home failed to comply with HUD rules and regulations regarding

required quality control procedures, even though those procedures were mandatory for

Residential Home's maintenance of its DEL Lender status.  Instead, Residential Home

maintained its DEL Lender status by making false representations to HUD about its purported

compliance with HUD rules and regulations regarding quality control.

### A. Residential Home Certified And Represented To HUD That It Would Comply With HUD's Mandatory Quality Control Requirements

63.     Throughout the Covered Period, Residential Home submitted annual certifications with HUD to obtain and maintain Residential Home's DEL Lender status.  In those annual certifications, Residential Home certified its compliance with all HUD rules and regulations necessary for maintenance of its DEL Lender status.

64.     For example, on or about February 18, 2010, Residential Home's Chief Executive Officer, acting on behalf of Residential Home, signed and submitted to HUD an annual certification stating "I know or am in the position to know, whether the operations of the above-named lender conform to HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, and policies . . . .  I certify that the lender complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with the Department."  Residential Home officers signed and submitted to HUD similar certifications each year between 2006 and 2012.

65.     One of the regulations referenced in the above-referenced annual certifications was the HUD regulation mandating continuous implementation of a quality control plan conforming to HUD rules, including the rule requiring review of all EPD Loans.  Complying with this regulation was a prerequisite to maintaining HUD approval for DEL Lender status.

### B. Contrary to Residential Home's Representations To HUD, Residential Home Failed to Comply With HUD's Quality Control Rules

66.     Contrary to its representations in its annual certifications, Residential Home failed to implement and maintain a quality control plan complying with HUD rules.

67.     Rather, as explained further below, Residential Home continually failed to implement basic quality control principles.

### 1) Residential Home Failed To Review All EPD Loans

68.     The HUD rules in effect during the Covered Period required DEL Lenders to review all EPD Loans as a mandatory part of a compliant quality control program.

69.     Residential Home personnel failed to review all EPD Loans.  In fact, despite repeated representations to HUD that it would conduct EPD Loan reviews as part of its quality control program, Residential Home quality control personnel undertook no steps to identify and review any EPD Loans, much less all EPD Loans.

70.     In fact, Residential Home failed to conduct any reviews of EPD Loans.

71.     In addition, although Residential Home retained outside vendors to conduct certain loan audits and reviews, these vendors were never tasked with a review of EPD Loans for Residential Home.  Accordingly, Residential Home failed to undertake any review of its EPD Loans, either through outside vendors or its own quality control personnel.

### 2) Residential Home Ignored Quality Control

#### a) Residential Home Lacked Adequate Quality Control Procedures

72.     Although Residential Home had in place a quality control plan, as was required by HUD, this plan failed to provide for many of HUD's required procedures that were necessary in order to ensure that Residential Home's loans and internal processes consistently met the criteria for FHA insurance.

16

73.     Residential Home lacked formal procedures for: reporting quality control findings to firm management; reporting fraud or other serious violations to HUD; identifying patterns of underwriting deficiencies within its quality control reviews; reviewing the efficacy of its quality control process; taking corrective action against underwriters in connection with identified underwriting violations; and even for reviewing its own internal reports regarding the quality of its underwriting process..

74.     These deficiencies in procedure demonstrated the low priority that Residential Home placed on quality control, and further reflect that, although it repeatedly provided assurances to HUD that its quality control plan met the requirements of the DEL program, the stark reality was that Residential Home did not meet HUD's quality control requirements and, in fact, had no formal structure in which to even begin to meet those requirements.

75.     The absence of adequate procedures made it impossible for Residential Home to comply with the certifications that it had made to HUD, and on which HUD relied upon in authorizing Residential Home to operate as a DEL Lender.

**b) Residential Home Failed To Invest the Resources Necessary to Maintain a Functional Quality Control Program**

76.     Residential Home's total failure to implement formal procedures to govern quality control was further exacerbated by the low priority it gave to quality control from a staffing standpoint.

77.     In spite of its substantial loan volume, throughout the Covered Period, Residential Home relied on a single compliance officer who was tasked with all aspects of Residential Home's quality control program, including individual loan reviews.

17

78.    This lone compliance officer worked in an environment where she was forced to spend the overwhelming majority of her time conducting reviews of individual loan files.

79.    Because this single employee's time was wholly occupied by individual loan reviews, Residential Home was structurally incapable of dedicating the staff resources necessary to put in place the kinds of quality control procedures HUD required of DEL lenders.

80.    In spite of the fact that its management consistently observed that its single compliance worker was overwhelmed by her work load, Residential Home failed to take any steps to alleviate the pressures on this employee.

81.    Instead, Residential Home management constantly inundated its lone compliance officer with competing and piecemeal review requests.  Such review requests focused on reactionary reviews of individual FHA loan files.

82.    The reactionary and reflexive nature of Residential Home's compliance program accordingly made it impossible for Residential Home to do the type of systematic reviews, such as of all EPD loans, required by HUD.

83.    Moreover, as a result of the insufficient staff resources dedicated to compliance, not only did Residential Home fail to undertake certain HUD-required reviews, such as of all EPD loans, it also failed to complete in a timely manner those reviews that it did undertake.

84.    Although HUD imposes a 90-day time period for quality control reviews, Residential Home completed many of its quality control reviews outside of this time frame.

85.    Residential Home management repeatedly discussed and debated the merits of investing more resources into quality control functions, but the company ultimately did nothing to address the limitations of its program.

18

### 3) Residential Home Failed to Report Identified Problems to HUD

86.     Even setting aside the severe deficiencies in Residential Home's quality control program itself, Residential Home further failed to take action even when its own quality control reviews uncovered indicia of fraud or other serious violations.

87.     Although Residential Home had represented through its annual certifications that it would self-report instances where it identified loans with indicia of fraud or other serious violations directly to HUD, even when its quality control reviews uncovered such indicia/violations, Residential Home never took action to report these findings to HUD.

88.     Had HUD known that Residential Home had failed to implement and maintain a compliant quality control program, and specifically, that Residential Home's quality control program suffered from the defects identified herein, HUD would not have permitted Residential Home to act as a DEL Lender and endorse loans for FHA insurance.

89.     Residential Home's representations regarding its quality control program in its annual certifications were reckless, grossly negligent, and/or negligent, and in making these representations, Residential Home violated its duty of care and fiduciary obligations to HUD.

### C. Residential Home Abused Its DEL Lender Status to Endorse Mortgages Ineligible for FHA Insurance

90.     Residential Home abused the DEL Lender status that it maintained by recklessly approving loans for FHA insurance notwithstanding that the loans did not meet the HUD requirements for such insurance.  In particular, as a DEL Lender, Residential Home regularly

violated HUD rules, prudent underwriting practices, and its duties to HUD, by failing to conduct due diligence on mortgages that it reviewed and approved for FHA insurance.

91.     For example, Residential Home routinely approved for FHA insurance loans that suffered from obvious underwriting defects.  Such obvious underwriting defects included: loans where the borrower's qualifying ratios significantly exceeded HUD's benchmarks without documenting acceptable compensating factors; failures to verify and document whether gift funds were from an acceptable source; incorrectly calculated borrower incomes; and failure to adequately evaluate the borrower's prior mortgage payment history.  These obvious underwriting defects rendered false the loan-level certifications that Residential Home made to HUD in connection with each of these loans.

92.     Even when the results of its own quality assurance reviews indicated that its underwriting process was "poor" and had an extremely high defect rate, as it did in Q4 of 2010, when it identified a defect rate of 72%, Residential Home failed to take any steps to address the reckless underwriting practices of which it had notice.  Through these internal quality assurance reviews, Residential Home was put on notice that it had approved for FHA insurance hundreds of loans that did not meet HUD's underwriting requirements and therefore were ineligible for such insurance.

93.     When confronted with the high defect rates, however, Residential Home management failed to confront the deficiencies in the underwriting process that lead to the approval of loans that failed to meet HUD's underwriting requirements.

94.     Residential Home management instead simply pushed employees to approve more and more loans, in the hopes that greater overall loan volume would somehow result in a lower defect rate.

95.     At the same time, as it took steps which resulted in an even greater number of ineligible loans being approved for FHA insurance, Residential Home continued to falsely certify, on a loan-by-loan basis, that it had complied with HUD rules and that the mortgages it endorsed were eligible for FHA insurance under HUD rules, when in many cases they were not.

96.     In making these certifications, Residential Home either knew, or acted in deliberate ignorance and/or reckless disregard of the truth that its underwriting practices failed to exercise the due diligence required by HUD and had resulted in the approval of hundreds of loans that failed to meet the HUD underwriting requirements.

97.     Had HUD known that many of Residential Home's loan-level certifications were false, and that Residential Home was indeed aware of the inadequacies of its own underwriting practices, HUD would not have permitted Residential Home to endorse those loans for FHA insurance.

98.     Residential Home's representations were reckless, grossly negligent, and/or negligent, and in making these representations, Residential Home violated its duty of care and fiduciary obligations to HUD.

**IV.      HUD HAS PAID A SUBSTANTIAL AMOUNT IN INSURANCE CLAIMS BASED ON MORTGAGES IMPROPERLY ENDORSED BY RESIDENTIAL HOME**

21

99.     The false certifications and representations by Residential Home regarding purported compliance with HUD quality control requirements permitted Residential Home to endorse more than four thousand mortgages for FHA insurance during the Covered Period.

100.    Moreover, as a result of Residential Home's above-referenced reckless underwriting practices, many of those four thousand loans that Residential Home endorsed for FHA insurance during the Covered Period did not comply with HUD underwriting standards and therefore were ineligible for such insurance.

101.    Throughout the Covered Period, Residential Home submitted to HUD a substantial number of FHA insurance claims and related costs arising out of Residential Home's approval of mortgages for FHA insurance, including loans that failed to comply with HUD's underwriting standards.

## FIRST CLAIM

### Violations of the False Claims Act
### (31 U.S.C. § 3729(a)(1) (2006), and as amended, 31 U.S.C. § 3729(a)(l)(A))
### Causing False Claims

102.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

103.    The Government seeks relief against Residential Home under Section 3729(a)(l) of the False Claims Act, 31 U.S.C. § 3729(a)(l) (2006), and, as amended, Section 3729(a)(l)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(l)(A).

104.    As set forth above, Residential Home knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented and/or caused to be presented, to

an officer or employee of the Government, false and fraudulent claims for payment or approval

in connection with its endorsement of FHA-insured mortgages.

105.     The Government paid insurance claims, and incurred losses, relating to FHA

insurance claims submitted by Residential Home during the Covered Period for mortgages that

had been wrongfully endorsed by Residential Home because of Residential Home's wrongful

conduct.

106.     By reason of the false claims of Residential Home, the Government has been

damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as

required by law for each violation.

**SECOND CLAIM**

**Violations of the False Claims Act**
**(31 U.S.C. § 3729(a)(l)(B))**
**Use of False Statements**

107.     The Government incorporates by reference each of the preceding paragraphs as if

fully set forth in this paragraph.

108.     The Government seeks relief against Residential Home under Section

3729(a)(I)(B) of the False Claims Act, 31 U.S.C. § 3729(a)(l)(B), or, in the alternative, under

Section 3729(a)(2) of the False Claims Act, 31 U.S.C. § 3729(a)(l) (2006).

109.     As set forth above, Residential Home knowingly, or acting in deliberate ignorance

and/or with reckless disregard of the truth, made, used, or caused to be made or used, false

records and/or statements material to false or fraudulent claims in connection with Residential

Home's endorsement of FHA-insured mortgages.

110.    The Government paid insurance claims, and incurred losses, relating to FHA insurance claims submitted by Residential Home during the Covered Period for mortgages that had been wrongfully endorsed by Residential Home because of Residential Home's wrongful conduct.

111.    By reason of the false records and/or statements of Residential Home, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## THIRD CLAIM

## Breach of Fiduciary Duty

112.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

113.    Residential Home was a fiduciary of the Government, and owed the Government fiduciary duties.

114.    As a fiduciary, Residential Home had a duty to act for, and give advice to, the Government for the benefit of the Government as to whether mortgages should be insured by FHA under the DEL program.

115.    As a fiduciary, Residential Home had a duty of *uberrmiae fidea*, or, the obligation to act in the utmost good faith, candor, honesty, integrity, fairness, undivided loyalty, and fidelity in its dealings with the Government.

116.    As a fiduciary, Residential Home had a duty to refrain from taking advantage of the Government by the slightest misrepresentation, to make full and fair disclosures to the

Government of all material facts, and to take on the affirmative duty of employing reasonable care to avoid misleading the Government in all circumstances.

117.    As a fiduciary, Residential Home had a duty to exercise sound judgment, prudence, and due diligence on behalf of the Government in endorsing mortgages for FHA insurance.

118.    As set forth above, Residential Home breached its fiduciary duty to the Government.

119.    As a result of the breach of the fiduciary duties of Residential Home to the Government, the Government has paid insurance claims, and incurred losses, relating to FHA insurance claims submitted by Residential Home during the Covered Period.

120.    By virtue of the above, the Government is entitled to compensatory and punitive damages, in an amount to be determined at trial.

## FOURTH CLAIM

### Gross Negligence

121.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

122.    Residential Home owed the Government a duty of reasonable care and a duty to conduct due diligence.

123.    As set forth above, Residential Home breached its duties to the Government.

124.    As set forth above, Residential Home recklessly disregarded its duties to the Government.

25

125.    As a result of the gross negligence of Residential Home, the Government has paid insurance claims, and incurred losses, relating to FHA insurance claims submitted by Residential Home during the Covered Period.

126.    By virtue of the above, the Government is entitled to compensatory and punitive damages, in an amount to be determined at trial.

### FIFTH CLAIM
### Negligence

127.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

128.    Residential Home owed the Government a duty of reasonable care and a duty to conduct due diligence.

129.    As set forth above, Residential Home breached its duties to the Government.

130.    As a result of the negligence of Residential Home, the Government has paid insurance claims, and incurred losses, relating to FHA insurance claims submitted by Residential Home during the Covered Period.

131.    By virtue of the above, the Government is entitled to compensatory damages, in an amount to be determined at trial.

### SIXTH CLAIM
### Indemnification

132.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

133.    Residential Home owed the Government a duty of reasonable care and a duty to conduct due diligence.

134.    As set forth above, Residential Home breached its duties to the Government.

135.    As a result of the breach of the duties of Residential Home to the Government, the Government has paid insurance claims, and incurred losses, relating to FHA insurance claims submitted by Residential Home during the Covered Period.

136.    By virtue of the above, the Government is entitled to indemnification of its losses relating to claims for FHA insurance wrongfully submitted by Residential Home during the Covered Period.

WHEREFORE, the Government respectfully requests that judgment be entered in its favor and against Residential Home as follows:

a.   For treble the Government's damages in connection with Counts One and Two, in an amount to be determined at trial;

b.   For compensatory damages in connection with Counts Three, Four, Five, and Six, in an amount to be determined at trial, and, in the alternative, for indemnification;

c.   For such civil penalties as are required by law;

d.   For punitive damages;

e.   For an award of costs pursuant to 31 U.S.C. § 3729(a); and

f.   For an award of any such further relief as is proper.

Date:   New York, New York
        September 21, 2017


                        JOON H. KIM
                        Acting United States Attorney for the
                        Southern District of New York
                        *Attorney for United States of America*

            By:     /s/ *Jessica Jean Hu*
                        JESSICA JEAN HU
                        ELIZABETH M. TULIS
                        Assistant United States Attorney
                        86 Chambers Street, Third Floor
                        New York, New York 10007
                        Tel.:  (212) 637-2726/2725
                        Fax:  (212) 637-2717
                        E-mail:   jessica.hu@usdoj.gov
                                        elizabeth.tulis@usdoj.gov

28